IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA        )
                                )
            v.                  )        1:19CR481-1
                                )
JAMEL RAMEL HASKINS             )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court is Defendant's motion to suppress all
evidence seized as a result of a traffic stop on June 3, 2018,
in Durham, North Carolina. (Doc. 14.) The Government filed a
response. (Doc. 18.) On November 5, 2019, this court held a
hearing on the motion to suppress. (See Minute Entry
11/05/2019.) The Government called as a witness Durham Police
Officer J.C. Kellar ("Kellar"). At the conclusion of the
hearing, this court made preliminary findings of fact. This
court also requested additional briefing based upon those
findings of fact. Both the Government and Defendant filed
supplemental briefs. (Docs. 23, 24.) A second round of
supplemental briefing was requested by the court, (Text Order
11/18/2019), and filed by the parties. (Docs. 26, 27.) A second,
final hearing was held on December 2, 2019, where the parties
addressed several of the court's lingering questions of law.

(Minute Entry 12/02/2019.) The matter is now ripe for ruling. For the reasons stated below, the court will grant Defendant's motion to suppress.

In summary, the Government contends Kellar had a reasonable, articulable suspicion of criminal activity based upon the following factors: time of the occurrence, the high crime nature of the area, the observation of individuals around a vehicle stopped in the roadway, Kellar's recognition of the individuals standing beside the car as having some history of drug-related criminal activity, and the fact the stopped vehicle pulled away as Kellar subsequently approached the area where the vehicle was stopped.

This court finds Kellar had an inchoate suspicion of criminal activity, later proved correct, to some degree,[1] following his stop of Defendant. However, this court is of the opinion that Kellar's suspicion did not provide an objective, reasonable suspicion of criminal activity sufficient to stop and detain Defendant. This court made its findings of fact on the record. They will be supplemented and further addressed as necessary here. This court will correct one finding made in open court.

---

[1] During the stop, Kellar called for a K9 unit to conduct an exterior sniff of the vehicle. The dog alerted, but no drugs were found. A firearm was discovered.

# I.  <u>LEGAL FRAMEWORK</u>

There is no dispute that Defendant was seized when Kellar turned on his blue lights and pulled over Defendant in the Five Star Tobacco parking lot off of Holloway Street. The issue in this case is whether Kellar's earlier observation of Defendant when he was stopped on North Briggs Avenue provided a reasonable suspicion of criminal activity sufficient to support the subsequent traffic stop.

> To be lawful, a <u>Terry</u> stop "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." The level of suspicion must be a "particularized and objective basis for suspecting the particular person stopped of criminal activity." As such, "the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." There is no reasonable suspicion merely by association.

<u>United States v. Black</u>, 707 F.3d 531, 539 (4th Cir. 2013) (quoting <u>Reid v. Georgia</u>, 448 U.S. 438, 440 (1980); <u>United States v. Griffin</u>, 589 F.3d 148, 152 (4th Cir. 2009); <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968)).In conducting a reasonable suspicion analysis, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417–18 (1981)).

- 3 -

"A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." Id. at 277. A court is required to give due weight to factual inferences drawn by law enforcement officers. Ornelas v. United States, 517 U.S. 690, 699 (1996). A court must examine the totality of the circumstances by considering "all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989). Courts must also "evaluate the 'cumulative information available' to the detaining officer, rather than engaging in 'piecemeal refutation' of the individual facts upon which the officer relied during the Terry stop." United States v. McBride, 676 F.3d 385, 392 (4th Cir. 2012) (quoting United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008)); United States v. Whitehead, 849 F.2d 849, 858 (4th Cir. 1988)).

"Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." Branch, 537 F.3d at 337. Reasonable suspicion is a burden "less demanding than that for probable cause" and "considerably less than proof of wrongdoing by a

preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). However, an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" Id. (quoting Terry, 392 U.S. at 27). The factors articulated "together must serve to eliminate a substantial portion of innocent [persons] before the requirement of reasonable suspicion will be satisfied." United States v. Brugal, 209 F.3d 353, 359 (4th Cir. 2000) (en banc).

## II.  ANALYSIS

Although the reasonable suspicion analysis "must account for the 'totality of the circumstances,' rather than employ a 'divide-and-conquer analysis,'" United States v. Williams, 808 F.3d 238, 247 (4th Cir. 2015) (citing Arvizu, 534 U.S. at 274), "this court 'will separately address each of the factors before evaluating them together with the other circumstances of the traffic stop,'" United States v. Bowman, 884 F.3d 200, 214 (4th Cir. 2018) (quoting United States v. Powell, 666 F.3d 180, 187–88 (4th Cir. 2011)).

### A.  Individual Analysis of Articulated Factors

Two of the facts articulated by Kellar reasonably and objectively contribute to the reasonable suspicion analysis in this case and are not disputed: (1) the lateness of the hour, and (2) the high crime nature of the neighborhood. Neither of

these facts, however, independently support a finding of
reasonable suspicion.

First, Kellar initially observed Defendant's vehicle at
approximately 11:40 p.m. The time of day is not disputed. Kellar
did not testify that the lateness of the hour contributed
significantly to his assessment of the situation. He did not
describe, in his experience, that any particular times of day
were more indicative of criminal conduct than any other times of
day. Nevertheless, the hour was late, although not unreasonably
so. See, e.g., United States v. Glover, 662 F.3d 694, 698 (4th
Cir. 2011) (noting that a time of 4:40 a.m. was a relevant
factor); United States v. Slocumb, 804 F.3d 677, 679 (4th Cir.
2011) (noting that the fact activity took place at midnight was
a factor that contributed to reasonable suspicion). The lateness
of the hour in this case, 11:40 p.m., is an objective,
articulated fact that will be considered in the analysis below.
However, while the late hour is a factor, it is not
independently sufficient to support a finding of reasonable
suspicion.

Second, the fact that North Briggs Avenue was a high crime
area is relatively undisputed. This court credits Kellar's
testimony that this was in fact a high crime area and subject to
heightened enforcement by Durham police. "[A]n area's

disposition toward criminal activity is an articulable fact."
United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987).
However, while the nature of the area around North Briggs Avenue
is relevant, "presence in an area of expected criminal activity,
standing alone, is not enough to support a reasonable,
particularized suspicion that the person is committing a crime."
Illinois v. Wardlow, 528 U.S. 119, 124 (2000). "[A]lthough the
high-crime nature of the area in which a stop is performed is
plainly not alone enough to support a reasonable suspicion of
criminal activity, it is one of 'the relevant contextual
considerations' that a court may credit in the Terry analysis."
United States v. Bumpers, 705 F.3d 168, 175 (4th Cir. 2013)
(quoting Wardlow, 528 U.S. at 124). The court will, therefore,
consider the high crime nature of the neighborhood in its
analysis.

Other than these two facts, about which there is not any
real dispute, there are several other factual contentions that
are less clear and require a more thorough discussion.

First, while Kellar had no information as to the identity
of the occupant of the car, Kellar testified the three
individuals standing outside the car were known to him. Kellar
testified he knew those three individuals were "consumers, drug
addicts." (Transcript of Motion to Suppress Hearing ("Hr'g Tr.")

(Doc. 25) at 13.)[2] His previous interactions with them "had consisted of drug activity, misdemeanor breaking and entering." (Id.) Kellar clarified that he recognized those three people as individuals who participate in drug activity. (Id. at 21.) Though Kellar's initial testimony seemed to support an objectively reasonable belief that he was familiar with the individuals near Defendant's car, on cross-examination, Kellar further explained his knowledge, or lack thereof, of those individuals:

> Q:   And do you have any idea -- forgive me if you've answered this question. Do you have any idea when you interacted with these three people in terms of what year that was?
>
> A:   Oh, what year? 2018.
>
> Q:   Okay.
>
> A:   Yes.
>
> Q:   And can you give -- you mentioned a misdemeanor breaking and entering. Where did that misdemeanor breaking and entering occur?
>
> A:   I'm not sure, sir. I just -- it's -- again, the best way I can describe it is these are folks that I interacted with through my job responding to 911 calls, trying to be proactive, and they were associated with drug activity, breaking and entering. It's not something that I can -- I can't list their names for you. I can't give you a specific date. Those

---

[2]  All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

are just folks that I've interacted with through my
job.

Q:    Can you give any description of these three
individuals?

A:    Black males. Are you looking for clothing? I'm –
I don't mean to be --

Q:    I'm asking for as specific a description as you
can provide.

A:    Tall -- one of them is tall, skinny. He's about
6-foot-2, 6-foot-3, 40 to 50 years old. Again, always
in that same area. You just recognize faces. That's
one of them.

Q:    Do you know whether that individual lives in that
area?

A:    No, I don't. I believe he's homeless.

Q:    And can you recall specifically when you
interacted with that individual and where?

A:    No, sir.

Q:    Have you ever arrested that individual before?

A:    I believe that I have.

Q:    Okay. Do you know that you have?

A:    No, I don't know that I have. I believe that I
have, though.

Q:    And do you know what for?

A:    No, sir.

Q:    Okay. And what about the other two individuals?

A:    I couldn't tell you. I couldn't describe them.

(Id. at 31-32.) This court found, and continues to find, that Kellar is a credible witness in terms of his candor and truthfulness. However, this court is not able to find as a fact that the three individuals standing beside Defendant's car on June 3, 2018, were known to Kellar as individuals involved in drug-related criminal activity. Kellar's recollection as to the three men is too vague and inconsistent to permit the court to assess the objective reasonableness of his belief as to his identification of the three men or the reasonableness of his belief those three individuals had previously been involved in some type of drug-related criminal activity. The tall, skinny individual was the one about which Kellar's recollection was best, yet Kellar had no idea what he might have arrested him for previously and was uncertain whether he had in fact arrested him before. (See id. at 32.)

In other words, while this court accepts Kellar's testimony as truthful as to his belief, this court cannot reconcile the specific testimony, (id. at 13 ("I knew that [those three individuals] were consumers, drug addicts,")), with his vague testimony on cross-examination, (id. at 32 ("Q: And what about the other two individuals? A: I couldn't tell you. I couldn't describe them.")). Kellar is not able to provide sufficient objective facts to permit this court to find that his

identification of the individuals was reasonable or that his recollection of their prior activity is accurate or even reasonable. Kellar's opportunity to observe the three men was brief, he was not able to recall the circumstances under which he had seen the men in the past, nor was he able to provide any type of description of two of the individuals. This court finds Kellar's belief that the three men standing beside the car were or had been involved with controlled substances in some fashion is neither reasonable nor a reasonable mistake of fact.[3]

"A prior criminal record is not, standing alone, sufficient to create a reasonable suspicion." Powell, 666 F.3d at 188 (internal quotation marks omitted). In this case, the evidence does not reliably establish the three individuals had a criminal record, much less one that might suggest involvement in the

---

[3] An officer is not required to recite a full criminal history, a full description, or even a name in order for this court to find as a fact the officer had a reasonable, objective belief that individual was or is involved in drug activity. However, Kellar was only able to briefly observe the three individuals as he drove through the intersection at Holloway and North Briggs, and when pressed on cross-examination, he was not able to provide any objective basis for his belief other than that one of them was a homeless person for whom he could not recall anything other than he believed he had arrested him in the past. Kellar could not recall the reason for the arrest of the tall individual. Given Kellar's limited ability to describe anything of significance about the men or their criminal histories, this court does not find Kellar's belief to be a reasonable mistake of fact. Kellar did not appear to confuse the men with anyone else he knew.

purchase or sale of controlled substances. This court declines

to find as an objective fact that the three men standing beside

Defendant's car were in fact three individuals Kellar knew to

have a drug-involved criminal history.[4] For that reason, those

factual assertions will not be included in the court's analysis

of the totality of the circumstances.[5]

The next set of facts at issue are the circumstances

surrounding the Defendant's parked car and his subsequent

departure. The Government contends that a car stopped in the

roadway with three individuals standing beside it, along with

the fact that the car departed the area upon Kellar's approach,

---

[4] It is also notable Kellar's report did not contain any
mention of his belief the three men standing by the car were
previously involved in criminal conduct. The report apparently
does not mention familiarity with the three individuals or their
criminal histories at all. (See Hr'g Tr. (Doc. 25) at 26-27.)
This fact provides additional support for rejecting Kellar's
belief as to the criminal histories of any individuals standing
beside the car.

[5] The court does note that these findings regarding the
three individuals are arguably inconsistent with this court's
stated findings made immediately after the hearing. In open
court, this court stated that Kellar had "a reasonable belief
that historically one or more of those individuals had been
involved in drug or drug-related activity." To the extent that
finding is not consistent with the findings made above, it is
withdrawn. This court continues to believe, and finds, that
Kellar testified to what he truthfully believed to be the facts.
However, Kellar did not have a reasonable basis for his belief.
Kellar's belief, no matter how honest, is simply not supported
by objective facts which would permit a reasonable finding that
the identity or histories of these individuals should be
considered in the reasonable suspicion analysis.

are articulable facts which should be considered in the reasonable suspicion analysis.

The Government goes further, arguing that Kellar's observation of a car stopped in the roadway with three individuals standing by the passenger window and one leaning in towards the window are objective facts independently giving rise to reasonable suspicion. This court found that Kellar did in fact observe a car stopped on North Briggs Avenue, two to three car lengths back from the intersection with Holloway Street, with three individuals standing beside the passenger window and at least one leaning in or toward the window. There was no evidence presented that Defendant was committing a traffic violation or that Defendant's car was obstructing traffic at that time.

"[A]n officer and the Government must do more than simply label a behavior as 'suspicious' to make it so. The Government must also be able to articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011). Of course, trained officers may see through ostensibly innocent conduct, and a police officer may "draw on [his] own experience

and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 417–18). This court is required to give due weight to such factual inferences drawn by law enforcement officers. See Ornelas, 517 U.S. at 699.

That deference, however, is not unlimited, and such inferences drawn by law enforcement must still be supported by articulable facts and observable patterns. See Black, 707 F.3d at 540–41 ("[W]e would abdicate our judicial role if we took law enforcement-created rules as sufficient to establish reasonable suspicion."); Foster, 634 F.3d at 248; United States v. Delossantos, 536 F.3d 155, 161 (2d Cir. 2008) (noting, in the probable cause context, that "[a]s long as the elements of the pattern are specific and articulable, the powers of observation of an officer with superior training and experience should not be disregarded"); see also Wardlow, 528 U.S. at 123 ("[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop." (emphasis added)); United States v. Huerta, 655 F.3d 806, 809–10 (8th Cir. 2011) (discussing patterns of behavior used by a postal inspector to identify suspicious packages). Even a "wealth" of officer experience and training cannot overcome a dearth of objective

facts in a reasonable suspicion analysis. See United States v.
McCoy, 513 F.3d 405, 415 (4th Cir. 2008); Foster, 634 F.3d at
248; United States v. Williams, 321 F. Supp. 3d 594, 610 (D.S.C.
2018) ("[E]ven in the context of Officer Gordon's experience,
Defendant's behavior here is also consistent with that of an
innocent hotel guest . . . .").

In terms of this specific behavior in this case — the
stopped car with three men standing beside it — this court finds
the evidence insufficient to support a finding that this fact
alone is indicative of criminal behavior. Even viewing the scene
through Officer Kellar's experience does not change this
conclusion, since Officer Kellar had extremely limited time to
observe the scene and gather objective facts needed to draw a
reasonable inference based on his training and experience.

At the time of this traffic stop, Kellar had been a Durham
police officer for "[j]ust shy of three years." (Hr'g Tr. (Doc.
25) at 6.) In his experience, he had "personally participated in
surveillance, watching, witnessing drug transactions hand-to-
hands, whether that be in a vehicle, whether there be hand-in-
hand just in person, and ridden with [vice narcotics
investigators]." (Id. at 5.) Kellar testified that he was
familiar with car-based drug transactions and, apparently, that
these types of transactions occurred in this neighborhood. (See

- 15 -

id. at 6.) In Kellar's experience, that type of transaction allowed the sale to be conducted while permitting the seller to leave quickly – a stop followed by a transaction and departure. (Id. ("[I]t's an easy way to distribute narcotics . . . you pull up to a consumer or a buyer of narcotics, that person approaches the window, an exchange is made, and you're out of the area very quickly."))

Here, Kellar's brief view of the activity while passing through an intersection at thirty-five miles per hour did not permit him time to observe enough objective facts from which he could draw an inference based on his training and experience. At that speed, Kellar confirmed his "observations just lasted a few seconds." (Id. at 28.) Kellar did not and could not know how long Defendant's vehicle had been stopped and whether the stop was consistent with his experiences involving quick-exchange drug transactions. Further, as will be discussed below, Kellar did not see any conduct suggestive of a physical transaction between the occupant of the vehicle and the individuals outside the car; this factor has been a critical component in other reasonable suspicion analyses. See, e.g., McCoy, 513 F.3d at 413 (noting that individual suspected of buying drugs exited his car and entered the car of another, then got out and left); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); United

States v. Brown, No. 1:08CR253-1, 2008 WL 11417671, at *1
(M.D.N.C. Nov. 20, 2008), aff'd, 398 F. App'x 865 (4th Cir.
2010) (hand-to-hand drug transaction in Durham); see also United
States v. Keith, 559 F.3d 499, 504 (6th Cir. 2009) (noting
presence of reasonable suspicion for solicitation when a female
leaned towards a vehicle window to speak to a driver); United
States v. Sprinkle, 106 F.3d 613, 618 (4th Cir. 1997)
(emphasizing the importance of the fact that police could
actually see that nothing was passing between occupants of car).
Finally, although certainly not a controlling fact in this
analysis, Kellar described his experience in terms of a seller
pulling up to "a consumer or a buyer of narcotics." (Hr'g Tr.
(Doc. 25) at 6 (emphasis added).) In this instance, perhaps
slightly inconsistent with Kellar's experience, rather than one
individual, three men were standing beside the car with one
leaning toward or in the window. Kellar's observation was
sufficient to permit a conclusion that some type of interaction
was taking place between the pedestrians and the driver of the
car, but too limited to permit a reasonable suspicion of
criminal activity, at least standing alone without any other
factors.

Kellar did describe one individual who "appeared to be
leaning into the passenger's side window." (Id. at 11.) Both in

his report and in his testimony, Kellar used the word

"appeared." (Id. at 27.) Kellar did not see the individual's

hands inside the vehicle. (Id.) This court does not assign any

weight to this fact, as Kellar seems to be uncertain as to

whether he saw someone lean into the window consistent with a

possible hand-to-hand transaction or whether he saw a person who

appeared to be leaning in without any conduct suggestive of a

transaction of some type.[6] This court, again, credits Kellar's

candor as it is likely hard to determine what may be occurring

while looking to the left and at the same time driving through

an intersection at thirty-five miles per hour. Still, absent

persuasive historical testimony, this court is not prepared to

find, even in a high crime neighborhood, that any time the

driver of a vehicle stops to interact with individuals on foot

---

[6] In many respects, Kellar's experience as described is
compelling in terms of facts which might elevate an innocent
encounter to a suspicious encounter. The facts Kellar describes
of the pedestrian leaning over into the window in a manner to
permit a transaction rather than a greeting or discussion, even
if not followed by a quick exit, are facts which would likely
eliminate many innocent interactions between pedestrians and the
driver of a car, particularly in a high crime neighborhood. A
pedestrian leaning into the car followed by the driver/seller
making a quick exit could certainly serve to reasonably heighten
suspicions further. This court does not doubt Kellar's
experience in that regard. The issues in this case arise from
the uncertainty as to what Kellar saw and his inability, in
light of his brief observation, to present persuasive objective
testimony that what he saw gave rise to a reasonable suspicion
of criminal conduct as opposed to innocent conduct.

that that conduct is indicative of a drug transaction, nor does Kellar's experience in east Durham suggest that it would be. Rather, in light of Kellar's experience, it appears to this court that for the conduct to rise to a level suggestive of criminal conduct, some additional fact is required – a quick departure or leaning into the passenger area to conduct business away from the eyes of the public – to create a suspicion of illegal activity rather than an innocent encounter. Kellar's brief view of the individuals, even if one "appeared" to lean in the passenger window, is insufficient to suggest an exchange or attempt to exchange an item, an attempt to hide anything, or a hand-to-hand transaction. Kellar's consistent use of the word "appeared" to describe what he thought he saw suggests that for this court to find an individual "leaned in the passenger window" on the testimony, this court would have to have more confidence in Kellar's observation than Kellar himself seems to have.

In the absence of any context beyond a brief view of the scene as described while driving through the intersection, this court does not find these facts suggest the observed "behavior is . . . indicative of some more sinister activity than may appear at first glance," Foster, 634 F.3d at 248. Instead, this

court finds these facts similar to the dicta in <u>United States v.</u>
<u>McCoy</u>:

> Here, for example, if the question on appeal were
> whether Officer Loconti had a reasonable suspicion to
> detain and frisk McCoy after he had only observed
> McCoy drive the Eclipse into the Safeway parking lot
> and remain seated in the vehicle for a few minutes,
> the answer would certainly be no, for at that point,
> and no matter how extensive Loconti's experience,
> there simply were not enough articulable facts to
> support a <u>Terry</u> stop and frisk. Particularized,
> articulable facts are always required.

<u>McCoy</u>, 513 F.3d at 415.

Kellar's experience is insufficient, in itself, to support
a finding that his brief observation of Defendant's stopped car
with three pedestrians standing beside the passenger window
leads to a reasonable, articulable suspicion of criminal
activity.[7] Nevertheless, "acts that may appear innocuous in
certain contexts may suggest criminal activity under other
circumstances." <u>McBride</u>, 676 F.3d at 392. These facts will,

---

[7] Finally, this court has rejected Kellar's belief that the
individuals observed standing outside the car were known to him
to be involved in drug activity. In addition to the issues with
respect to the limited facts as described above, it is not clear
how much Kellar's suspicions were heightened because of his
experience with car-based drug transactions and leaning in the
passenger window or the fact that he thought the three men were
previously involved in drug activity.

therefore, be considered in the totality of circumstances analysis.[8]

The final fact the Government argues in support of reasonable suspicion is the fact that Defendant left the area when Kellar returned to the spot on North Briggs Avenue where he had first seen Defendant's vehicle. Leaving an area upon the arrival of police can support a finding of reasonable suspicion. See, e.g., Lender, 985 F.2d at 154; Sprinkle, 106 F.3d at 618. A hurried "flight" from police is more suspicious than leaving the

---

[8] As described previously in this analysis, and persuasively argued by the Government, this court is not to engage in a "piecemeal refutation of each individual fact and inference" as proscribed by United States v. George, 732 F.3d 296, 300 (4th Cir. 2013). (Government's Second Supplemental Response (Doc. 27) at 4.) This court agrees, as facts consistent with innocence can support reasonable suspicion, and courts should, under the appropriate circumstances, defer to a law enforcement officer's experience. However, this court does not believe it is required to find a fact simply because an officer testifies to that fact. Rather than reject a totality of circumstances analysis because all objective facts are consistent with innocence, see Whitehead, 849 F.2d at 858, this court has considered which facts are reliably established by the evidence presented. Here, this court has not found that the three pedestrians were known to Kellar as drug users because of the lack of objective facts to support Kellar's stated belief. This court has also declined to find that what Kellar saw, in the few seconds he had to observe the scene, was sufficiently consistent with his stated experience to support a finding that what he saw was reasonably indicative of drug distribution. Even Kellar did not contend that every time a car stops to interact with a pedestrian in that neighborhood at that time of night, illegal conduct is likely. As the finder of fact, it is this court's job to first determine which facts are sufficiently reliable to be included in the totality of circumstances analysis.

area in a calmer, more controlled manner. See United States v.

Sharpe, 470 U.S. 675, 682 n.3 (1985); Sprinkle, 106 F.3d at 618.

After initially seeing Defendant's vehicle, Kellar drove to
the next street, turned left, proceeded two blocks, turned left,
and then turned left on North Briggs heading north toward the
location where he had initially observed Defendant's vehicle. It
is not clear from this record how long Kellar's trip around the
block might have taken. In any event, by the time Kellar
returned to the area where Defendant had been stopped, Defendant
had moved his car to the parking lot of a store on the corner of
Holloway Street and North Briggs Avenue. As Kellar approached
the intersection behind another car, Defendant turned right on
Holloway and drove off. There was nothing unlawful, unusual, or
suspicious about Defendant's operation of the car.

This court finds a conclusion that Defendant departed the
parking lot because he saw Kellar's marked police car is not
reasonable. After listening to the testimony and reviewing the
video, it is difficult at best to tell whether, or how,
Defendant might have seen the patrol car as there was another
car in front of Kellar's patrol vehicle. While "[e]vasive
conduct, although stopping short of headlong flight, may inform
an officer's appraisal of a streetcorner encounter," Lender, 985
F.2d at 154, this court is not able to find from this evidence

that Defendant's conduct was evasive, nor does this court find
that Defendant departed in response to seeing Kellar's vehicle.
In the absence of any evidence that Defendant or the men
standing outside his car ever saw Kellar's vehicle or some
evidence to suggest one or more sought to evade law enforcement,
this court does not find the departure, standing alone, is
sufficient to support a finding of reasonable suspicion. The
record is too tenuous to support a conclusion that Defendant
drove away because of Kellar's approach, but it does support the
fact that Defendant was driving away by the time Kellar returned
to the intersection of Holloway and North Briggs. That limited
fact will be included in the analysis below.

### B.  <u>Totality of the Circumstances</u>

Standing alone, none of the foregoing facts provides an
independent basis for a reasonable, articulable suspicion that
Defendant was engaged in criminal activity. Nonetheless,
"reasonable suspicion may exist even if each fact standing alone
is susceptible to an innocent explanation." <u>McCoy</u>, 513 F.3d at
413-14. In conducting a reasonable suspicion analysis, a court
"must look at the 'totality of the circumstances' of each case
to see whether the detaining officer has a 'particularized and
objective basis' for suspecting legal wrongdoing." <u>Arvizu</u>, 534
U.S. at 273 (quoting <u>Cortez</u>, 449 U.S. at 417-18). When analyzing

the facts, they should, "in their totality, . . . eliminate a substantial portion of innocent [people]." Williams, 808 F.3d at 251.

To summarize the discussion above, this court finds the totality of facts present here are as follows.

On June 3, 2018, at around 11:40 p.m., Kellar was driving a marked patrol vehicle on Holloway Street through the intersection of Holloway and North Briggs Avenue. This area, Holloway and North Briggs, is a high crime area. As Kellar drove through the intersection of Holloway and North Briggs, he looked to his left. Defendant was stopped in the right lane of North Briggs Avenue. There is no testimonial evidence as to the weather, although the dash camera video suggests the night was clear. No evidence was presented as to whether the streets were crowded with pedestrians or deserted. According to the dash cam video, it does appear there was at least a moderate amount of vehicular traffic in the area.

Kellar observed Defendant stopped in the right lane of the roadway on North Briggs Avenue, two to three car lengths back from the intersection of North Briggs and Holloway. Defendant was not obstructing traffic or committing a traffic violation at that time. Three individuals were standing by the passenger window of Defendant's car and one of those individuals may have

been leaning toward the window or, more specifically, appeared to be leaning in the passenger window.

Kellar had experience with car-based drug transactions, but only viewed the stopped vehicle for a few seconds as he drove through the intersection on Holloway Street. In Kellar's experience, those car-based drug transactions are relatively quick, and Kellar had no idea how long the car had been stopped. Although he saw an individual leaning toward or in a window, he did not see any hand movements suggestive of a transaction, nor was he sure whether he saw one of the pedestrians leaning in the window or whether the pedestrian simply appeared to be leaning in the window.

After an indeterminate amount of time, Kellar returned to the spot where Defendant had stopped on North Briggs Avenue. By the time Kellar returned, Defendant had moved his car to a parking lot a short distance ahead, at the corner of Holloway and North Briggs, where he appeared to be stopped at least momentarily. As Kellar approached the intersection of North Briggs and Holloway behind another vehicle, Defendant departed the parking lot by turning right onto Holloway Street.

Taken together, these facts are similar to a case where the Fourth Circuit found a stop was not supported by reasonable suspicion. See Sprinkle, 106 F.3d at 615. In Sprinkle, officers

saw Poindexter, a known drug user, sitting in the driver's seat of a car in an area known for drug dealing. Id. at 615–16. The officers then watched as Sprinkle, someone they did not know, exited a nearby building and got into the passenger seat of the same car. Id. at 616. The two men then huddled over the center console and then passed or were about to pass something between them. Id. Just then, the officers walked by, and Sprinkle then "put his head down and put his hand to the left side of his face as if to conceal his face from [the officers] seeing him." Id. The officers were able to see in the car and the two men's hands — they did not observe any contraband. Id. at 617. Once the officers had walked past the car, the two men immediately drove away, though not erratically or evasively. Id. at 616–17. The Fourth Circuit ultimately held that these factors, even when combined, could not give rise to a reasonable suspicion that criminal activity was afoot. Id. at 618–19.

In a lengthy footnote, the Sprinkle court distinguished the facts before it from the facts in United States v. Lender, 985 F.2d 151 (4th Cir. 1993), a case which the Government now relies on in this case. As Sprinkle was distinguishable from Lender, so is the case at bar.

In Lender, police officers in Kinston, North Carolina, were patrolling a high crime area known for drug trafficking.

Lender, 985 F.2d at 153. The time was 12:50 a.m. when the police saw a group of four to five men huddled around the defendant's opened palm. Id. All the men were looking down at the defendant's palm. Id. Suspecting a drug transaction, the police officers got out of their car and approached the men; at that point, the men immediately dispersed and the defendant started to walk away from the officers, telling them, "You don't want me." Id.

Based on these facts, the Sprinkle court distinguished its facts from Lender as follows:

> Several factors distinguish Lender. First, although the police could not see (from their passing car) into Lender's open hand, the fact that several men were looking to his hand indicated there was actually something in it. Here, although Poindexter and Sprinkle had their hands close together, Officer Riccio was close enough to see that their hands appeared empty. Thus, Riccio's initial suspicion that Sprinkle was about to pass something to Poindexter was simply not confirmed by what Riccio actually saw. Second, Lender engaged in what we considered evasive conduct when he turned his back on the approaching officers and walked away. Here, the district court found that Poindexter, who "didn't pull off in any hurry," was not being evasive. . . . Third, in Lender we determined that the lateness of the hour (1:00 a.m.) properly contributed to reasonable suspicion.

Sprinkle, 106 F.3d at 618 n.3.

The present case is distinguishable from Lender in some of the same ways Sprinkle was; it is also distinguishable in ways even Sprinkle was not. Though the present case did take place

late at night, as in <u>Lender</u>, there is an absence of obvious flight in the face of police. Like <u>Sprinkle</u>, the present case is also distinguishable from <u>Lender</u> in that the observed conduct was not suggestive of criminal activity. The <u>Sprinkle</u> court distinguished its facts from <u>Lender</u> because the officers could see into the car and did not observe any drugs or weapons. Here, the facts are distinguishable in that the conduct Officer Kellar observed was too ambiguous to suggest a drug transaction. Three people standing near a car parked on the side of a residential street with one person "appearing" to lean in, even when it occurs late at night and in a high crime area, does not present circumstances that eliminates a substantial portion of innocent persons in the way the group staring into an open palm in <u>Lender</u> did.

This case is also distinguishable from <u>Lender</u> in ways that even <u>Sprinkle</u> was not, making the present facts arguably weaker than those in <u>Sprinkle</u>. As discussed above, Officer Kellar did not provide an objective basis for concluding that he was aware any of the individuals standing near the car were known drug offenders. In <u>Sprinkle</u>, by contrast, one of the officers was familiar with Poindexter and his history as a drug offender. Further, the individuals in <u>Sprinkle</u> drove away as soon as officers passed them on foot. Though the Fourth Circuit did not

find this fact extraordinary by itself, see Sprinkle, 106 F.3d at 618, it is another possible suspicious factor that is absent here.[9] Finally, whereas Sprinkle tried to hide his face from police, here there is no indication that Defendant attempted to conceal his identity in any way.

In all, Sprinkle and its comparison to Lender leads this court to the conclusion that the facts credited above, even when taken together in a totality analysis, do not lead to an objectively reasonable suspicion that criminal activity was afoot when Officer Kellar passed by Defendant's parked car. Other cases support this same conclusion. See Black, 707 F.3d at 539 (finding that the following facts did not support reasonable suspicion: presence at a gas station without getting gas, arrest history of another individual, lawful possession and display of a firearm, voluntary submission of ID, and high crime area at night); Foster, 634 F.3d at 245; Williams, 321 F. Supp. 3d at 610 ("Instead, [the officer] merely observed Defendant in the vicinity of a high crime, open air drug market, conversing with other individuals in public. In this case, Defendant's interaction with individuals involved in the drug trade in a

---

[9] As noted above, the evidence supports the finding that Defendant was driving away when Kellar returned to the intersection, not that he was driving away because of Kellar's approach.

public place does not lead to a reasonable belief the he too is involved in the drug trade or other criminal activity.").

Though the present case presents some suspicious circumstances, the factors are all, by themselves, not indicative of criminality, and "[a]lthough the nature of the totality-of-the-circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." Bowman, 884 F.3d at 219. Those concrete reasons can come in the form of officer training and experience, but, for the reasons discussed above, Officer Kellar's observations were too limited to apply his training and experience in a way that is objectively reasonable. As indicated by cases like Sprinkle, Black, and Williams, this is true even when the location and time of night are added to the totality. Guided by these cases and others cited above, the court concludes that the totality of the circumstances does not give rise to an objectively reasonable suspicion that criminal activity was afoot.

In addition to arguing that this case is controlled by Lender, the Government also contends that three other cases, though not controlling, compel a conclusion that these facts

rise to the level of reasonable suspicion. Those cases are:
<u>United States v. Hurd</u>, 785 F.3d 311 (8th Cir. 2015); <u>United
States v. Keith</u>, 559 F.3d 499 (6th Cir. 2009);[10] and <u>United
States v. Lopez-Garcia</u>, 565 F.3d 1306 (11th Cir. 2009). For the
reasons below, the court finds these authorities unconvincing.

<u>Lopez-Garcia</u> is admittedly similar to this case, but it is
distinguishable in certain critical respects. First, in <u>Lopez-
Garcia</u>, "[a]s [the officer's] cruiser approached, the man at the
car's window looked up, turned around, and walked away; and the
car drove away from the officer's cruiser." <u>Id.</u> at 1310. The
court in that case found as a factor in support of reasonable
suspicion that "once they saw [the officer], the individual
abruptly withdrew from the car window, and Lopez-Garcia began to
drive away." <u>Id.</u> at 1314. In this case, by contrast, there are
no facts which support a finding that the individuals and
Defendant departed the area in response to seeing Kellar's
police vehicle at any point.

Second, in <u>Lopez-Garcia</u>, the officer saw an individual
"leaning into the passenger side window and speaking to the
driver." <u>Id.</u> In this case, however, Kellar described one

---

[10] The Government cites to <u>Keith</u>, a case where the court
found no reasonable suspicion existed, to draw conclusions by
deduction. The court is unconvinced by these deductions and will
not further address them or <u>Keith</u> in this opinion.

individual who "appeared to be leaning into the passenger's side window," (Hr'g Tr. (Doc. 25) at 11), and this court is not able to credit that Kellar in fact saw an individual lean in the window given the quick view that he had from Holloway Street. For these two reasons, the court is unpersuaded by Lopez-Garcia.

Likewise, this court does not find Hurd persuasive on the facts present here. In Hurd, the car was stopped in the middle of the night on a dark street in an area that was poorly lit and not near any houses or businesses. Hurd, 785 F.3d at 314. In Hurd, there also does not seem to be any dispute as to what the officer observed or whether it was or was not consistent with his experience and training. Specifically, the officer found it odd to see someone standing outside a car given the darkness, the cold, and the absence of houses or buildings nearby. The court also credited Hurd's refusal to remove his hands from his pockets despite orders from the officers. Id. Here, by contrast, no evidence has been presented to suggest that it was unusual for a person or persons to be outside, nor is there any suggestion that it was unusual for a group of pedestrians to speak with the driver of a vehicle, as occurred here. As discussed above, the facts are too uncertain to convert what might have been innocent conduct into suspicious conduct based upon Kellar's experience and his limited observation.

For all these reasons, the court concludes that Officer Kellar had an inchoate suspicion when he stopped Defendant on June 3, 2018. Officer Kellar did not, however, possess an objectively reasonable suspicion justifying the stop. For that reason, the evidence seized as a result of that stop should be suppressed. <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 487–88 (1963); <u>United States v. Seidman</u>, 156 F.3d 542, 548 (4th Cir. 1998).

## III.  <u>CONCLUSION</u>

For the reasons outlined herein,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress, (Doc. 14), is **GRANTED** and that evidence seized as a result of the search is hereby **SUPPRESSED**.

This the 12th day of December, 2019.

_William L. Osteen, Jr._
United States District Judge
